**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MARJORIE WAGONER

*Plaintiff*,

vs.

PFIZER, INC.,

*Defendant.*

Case No. 07-1229-EFM

**MEMORANDUM AND ORDER**

Before the Court is Defendant Pfizer, Inc's Motion for Summary Judgment (Doc. 142.) The motion has been fully briefed and is ripe for decision. For the following reasons, the Court GRANTS the motion.

-1-

**I. Facts[1]**

Plaintiff, Marjorie Wagoner, was employed at Defendant, Pfizer, Inc., a pharmaceutical company, as a professional sales representative. She began work at Pfizer in 1980 and remained there until her termination on July 14, 2006.  At the time of her termination, she was 56 years old. She alleges that she was terminated on the basis of her age.

Plaintiff's sales territory included the area in and around Wichita, Kansas.  Sales representatives are assigned to a division and divided into sales districts of eight to ten representatives.  Each district is managed by a District Manager.  The District Manager reports to a Regional Manager.

On September 1, 2005, Pfizer underwent a reorganization called the Field Force Optimization ("FFO").  After the reorganization, Plaintiff's territory included the Wichita area and also included Johnson County, Kansas.  Clark Mohar became Wagoner's District Manager, and JoAnn Yeksigian became Wagoner's Regional Manager. Mohar had previously been Wagoner's District Manager for a portion of 1999 and 2000.

Pfizer's sales representatives are given "starters" which are "product samples" to be distributed to physicians during sales calls. Whenever a sales representative gives a starter to a

_____

[1]In accordance with summary judgment procedures, the facts are related in the light most favorable to the non-moving party.  The Court notes that D. Kan. Rule 56.1 requires the parties to provide a concise statement of material facts with the appropriate cite to the record that supports the fact. The party disputing a fact must provide an appropriate cite to the record that supports its contention.  There were numerous occasions where Plaintiff controverted facts but did not provide a record cite. In accordance with D. Kan. Rule 56.1, the Court deems admitted for purposes of summary judgment all facts not controverted with an appropriate cite to the record.  The Court has reviewed the record and set forth the *material* facts to which there is no genuine dispute. Additional facts that require an in depth discussion are set forth in the particular section pertaining to those facts.

physician, the representative is required to complete a "starter form," a carbon copy form. One copy is sent to Pfizer's Starter Operations group, and one copy is retained by the sales representative for three years. These forms are used to record the transfer of starters to licensed prescribers. Starter forms are numbered sequentially and bound in pads containing 25 forms per pad.

The Prescription Drug Marketing Act ("PDMA") was enacted in the late 1980's. Pursuant to the PDMA, Pfizer must report to the FDA any known misstatement of what happened during a starter transaction. Pfizer also must make the starter forms available to the FDA.

Pfizer's starter administration policy requires sales representatives to input an electronic record of each starter transaction into a secure electronic database. The written policy states that sales representatives must "sync daily." Wagoner stated that previous District Managers suggested that she enter starter transactions daily, but it was not reinforced by those managers and it was acceptable to sync at the end of the week.[2]

Pfizer's written Starter Administration Policy states that (1) sales representatives are required to document all starter transactions completely and accurately; (2) changes on the starter form after the doctor has signed the form requires the sales representative to initial the change to prevent an allegation of falsification; (3) starter activity forms that change after the recipient signs it may trigger suspicion of falsification; (4) Pfizer conducts audits of starter activity; (5) sales representative who do not comply with Pfizer's policies and procedures may be called to a meeting to evaluate the seriousness, and the meeting may include members from Senior Sales Management,

_____

[2]Doc. 154-3, p. 12. When citing to the exhibit submitted by the parties, the Court will cite to the document and page number assigned to the exhibits in the CM/ECF system rather than by the parties' exhibit number.

Legal, Security, and Human Resources; and (6) falsification of a starter form may trigger, at minimum, a report to the FDA which would include the sales representative's name and may lead to disciplinary action, up to, and including termination.[3]  Wagoner admits that she received a copy of Pfizer's Starter Administration Compliance Manual.

On September 12, 2005, Mohar conducted the first district meeting in Anaheim, California. During this meeting, Mohar spoke about his retirement plans.[4]  Mohar asked Wagoner when she planned to retire but did not ask anyone else at the meeting what their retirement plans were.[5] Wagoner responded that she did not intend to retire for some time because she had a daughter in college and another child in parochial school.

In October of 2005, an attorney for Pfizer, Kerry Sorvino, contacted Wagoner regarding another employee who had an "open door" complaint against Mohar.[6]  Wagoner told Sorvino that "in theory I could open my own door, you know, with regard to that comment" about when Wagoner intended to retire and there were actions by Mohar that she felt had been discriminatory.[7]  During the conversation with Sorvino, Wagoner also stated she "felt that Pfizer valued its older

---

[3]Doc. 144-3, pp. 103-10; Doc. 144-4, pp. 20-24.

[4]Doc. 144-3, pp.23-24.

[5]*Id.*

[6]Doc. 154-3, pp. 25-26.  Pfizer has a policy in which an employee may raise an "open door" complaint regarding concerns about their treatment without fear of retribution or retaliation. Doc. 144-20, p. 2, ¶ 2,  p. 5.

[7]*Id.*

employees."[8]   Sales representatives are expected to be working in the field between 8:00 a.m. and 5:00 p.m. Representatives submit their original receipts to their district managers to be reimbursed for lodging expenses.  On February 13-14, 2006, Wagoner stayed in Kansas City. When Wagoner submitted her expense report in early March, she turned in a duplicate copy of the hotel receipt on which she had purposefully covered up the check-in and check-out times.  Mohar informed Wagoner that she had turned in a non-original receipt.   Mohar contacted the hotel in Kansas City and obtained an unredacted copy of the receipt. The original receipt showed a check-in time of 2:50 p.m. and a check-out time of 1:35 p.m.  Wagoner states that she worked in the field during those days but that she checked in the hotel in the middle of the afternoon.  She stated that she covered up the check-in and check-out times to avoid what she thought would be potential harassment.   Wagoner admits that she exhibited "very poor judgment" with respect to the handling of the receipt.

On March 7, 2006, Mohar emailed an individual in Starter Administration at Pfizer with a copy to Regional Manager Yeksigian, requesting a starter activity report on Wagoner from January 1, 2006 to date because he had noticed some discrepancies.[9]  Mohar received the report the next day. Starter Operations runs a "Starter Activity Report" once a week for each of its sales representatives and sends the report to the representative for confirmation of the accuracy of the information. Starter Operations also runs a weekly "No Starter Activity Report" which is sent to regional

---

[8]*Id.*

[9]Doc. 154-15, p.5.

managers.[10]  The No Starter Activity Report identifies sales representatives that have not synched in, i.e., reported any sales transactions, in at least a week.[11]  Yeksigian reviews the "No Starter Activity Report" weekly and follows up with the district manager of representatives who appeared on the report.

In late April 2006, Wagoner's name appeared on a "No Starter Activity Report."  When Yeksigian contacted Mohar about Wagoner's name on the report, Mohar told Yeksigian that Wagoner had not indicated to him that she planned to be out of her sales territory.  Mohar also informed Yeksigian that Wagoner had submitted a hotel receipt for work-related travel reimbursement and had covered the check-in and check-out times.  Mohar informed Yeksigian that he had obtained the original receipt from the hotel, and the receipt indicated a check-in and check-out in the mid-afternoon.

Yeksigian asked Larry Guess, the assistant to the regional manager at Pfizer's regional office in Chicago, to prepare a preliminary summary of Wagoner's recent starter activity based on the starter form copies that Wagoner had in her possession.  Guess obtained the copies from Wagoner

---

[10]Doc. 144-7, p. 2, ¶ 5; Doc. 144-11, p. 4, ¶ 10. Plaintiff controverts this fact by stating that Pfizer did not produce a "No Starter Activity Report" during discovery, despite Plaintiff's requests for all documents concerning or relating to Plaintiff.  Defendant contends that Plaintiff's response is merely a discovery dispute regarding documents that Plaintiff knew about all along but failed to specifically request. Defendant further contends that these reports were overwritten every six months.  The Court finds Defendant's argument that Plaintiff never specifically requested or compelled the document to be disingenuous. Plaintiff's discovery requests were broad enough to cover production of this report, although there was not a specific request. If, however, the documents were overwritten every six months, the document would not have existed at the time the suit was filed in August of 2007.  Nonetheless, this document is not determinative of the case. Defendant has presented other documentary evidence pertinent to Defendant's investigation of Plaintiff's starter forms and termination.

[11]Doc. 144-7, p. 2, ¶ 5; Doc. 144-11, p. 4, ¶ 10.

and prepared a report for Yeksigian. Guess's preliminary review showed that Wagoner's forms appeared to have some incorrect dates and that Wagoner appeared to have written over and changed the dates on several forms.[12]  Guess also reviewed the starter activity Wagoner entered into the electronic database. Guess's review demonstrated that there were a number of times that Wagoner's starter forms were entered out of order.[13]

Seeking interpretation of Wagoner's starter activity trends, Yeksigian coordinated with Elizabeth Chaudhari, a manager in Pfizer's Human Resources Department in Chicago, to request a report from James Batura regarding Wagoner's starter forms.  James Batura was a Team Leader in Starter Operations and Pfizer's Director of Prescription Drug Marketing Act ("PDMA") Compliance. Batura completed the requested report on May 12, 2006.

Batura's report concluded  that Wagoner had recorded her starter transactions out of sequence and that there was the possibility that Wagoner was banking her forms, i.e., entering incorrect dates on starter forms to spread sales calls over a period of days.[14]  Batura recommended to Yeksigian that he perform a "random" physician audit before meeting with Wagoner.[15]  In Batura's email to Yeksigian, he explained the difference between a "longitudinal" audit and a random audit.  A longitudinal audit involved less practitioners but more detail, while a random audit

---

[12]Doc. 144-16, pp. 2-3, ¶¶ 3-4, pp. 6-14.

[13]Doc. 144-16, pp. 6-14; Doc. 144-7, pp. 3-4, ¶¶ 9-10, pp. 10-11. The calendar and email are documentary evidence indicating the total number of sequence changes for the months of September through February.

[14]Doc. 144-11, p. 5, ¶12; Doc. 144-13, pp. 44-64.  Batura's spreadsheet, attached to his May 12, 2006 email, is documentary evidence demonstrating Plaintiff's starter activity.

[15]Doc. 144-14, pp. 29-30.

involved more practitioners but less time.[16]   Batura recommended the random audit.[17]

The signature audit demonstrated that 20 of the 25 doctors responded and confirmed their signature and the quantities of medication.  The audit did not resolve the issue of the accuracy of the dates on Wagoner's starter forms.[18]   Chaudhari obtained the results from Batura and contacted Yeksigian to state that "Starter Admin didn't find much from the audit of Marjorie's starters, as you can see below.  So our last step is to bring her in."[19]

Yeksigian and Chaudhari arranged to meet with Wagoner in the Chicago regional office to discuss Wagoner's starter forms.  On June 27, 2006, Mohar informed Wagoner of the meeting in Chicago. Wagoner was not informed in advance of the purpose of the meeting.

On June 29, 2006, Yeksigian, Mohar, Chaudhari, and Guess met with Wagoner in Chicago. Mohar was only present for a portion of the meeting because he left early to catch his scheduled flight out of Chicago.   Yeksigian, Mohar, Chaudhari, and Guess took notes of the meeting.[20] They reviewed several documents with Wagoner, including Batura's report of her starter activity, and Yeksigian asked most of the questions.

The meeting with Wagoner lasted approximately four hours. Yeksigian, Chaudhari, and Guess stated that during the meeting Wagoner admitted to changing dates on her starter forms to

---

[16]Doc. 144-14, pp. 29-30.

[17]*Id.*

[18]Doc. 144-15, p. 3, ¶ 5; Doc-144-11, p. 6, ¶ 16.

[19]Doc. 144-15, p. 8.

[20]Doc. 144-3, p. 53.

balance out sales calls to have consistent sales each day.[21]  Wagoner states that she did not admit that

she changed dates on her starter forms, except to correct an inaccurate date.[22]

On June 29, 2006, after the meeting, Chaudhari emailed Batura sharing the results of the

interview with Wagoner. In her email, she stated that Wagoner admitted to altering dates to spread

calls across dates, and Chaudhari inquired whether the falsification of physician dates needed to be

reported to the FDA.[23]  Batura responded that Pfizer classifies "such actions as 'falsification' for

FDA reporting purposes, but will simply notify the Agency of what she did and why she claims to

have done it, without actually using that term."[24]  Batura subsequently filed a report with the FDA

informing the agency of Wagoner's "admission that, in order to report making a consistent number

of calls each day, she occasionally recorded dates other than those on which the calls were actually

made on her physician sample receipts."[25]

Wagoner emailed Yeksigian, Mohar, Guess, and Chaudhari on July 5, 2006 stating that the

meeting was very upsetting to her and that she was anxious to resolve any outstanding issues with

---

[21]Doc. 144-7, pp. 5-6, ¶¶15-17; Doc. 144-15, p. 4, ¶¶ 9-11, pp. 19-22; Doc.144-16, p. 4, ¶ 9 and pp. 16-18. Plaintiff asserts that the notes taken by Yeksigian, Chaudhari , and Guess could not be contemporaneous because they state that Wagoner changed dates, and she states that she did not make this admission. Plaintiff, however, has presented no evidence to support her allegation that the notes were not contemporaneous or accurate.

[22]Doc. 154-3, p. 33. At Plaintiff's deposition, she first stated that she did not tell anyone at the meeting that she changed dates entered by doctors to match the date she had entered, and she then stated that she did not recall stating this to anyone at the meeting.

[23]Doc. 144-15, pp. 12-13.

[24]*Id.*

[25]Doc. 144-14, pp. 32-33.

her administrative practices.  Yeksigian consulted with her manager, Amy Jenner, Vice President

of Sales for Pfizer, and Yeksigian informed Jenner of the findings of the investigation.  Yeksigian

and Jenner agreed to recommend to the Employee Relations Panel that Wagoner be terminated.[26]

Yeksigian and Jenner stated that they had no knowledge of Wagoner's age.[27]  Jenner stated that she

did not recommend termination based solely on Wagoner's admission and considered the entirety

of the evidence.[28]

　　　　During Yeksigian's tenure as Regional Manager, she recommended the termination of at

least one sales representative under the age of 40 for falsification of starter forms.[29]  Yeksigian also

initiated a starter administration investigation for another sales representative under the age of 40.[30]

That investigation resulted in termination based on falsification of starter forms although the sales

representative did not admit to falsifying forms.[31]

　　　　On July 14, 2006, Mohar and Cheryl James, Director of Human Resources and Chaudhari's

manager, telephoned Wagoner to inform her that she was being terminated for falsifying starter

forms which was a violation of the PDMA and Pfizer policy.  James stated that Pfizer consistently

---

[26]Doc. 144-7, p. 6, ¶ 19; Doc. 144-19, p. 3, ¶ 9.

[27]Doc. 144-7, p. 6, ¶ 19; Doc. 144-19, p. 3, ¶ 11. Plaintiff attempts to controvert the fact that Yeksigian and Jenner did not know Wagoner's age by stating that Jenner and Yeksigian had access to Wagoner's personnel file. Plaintiff also asserts in her post-deposition affidavit that Yeksigian was aware that Wagoner was at least 40 years old because they had met several times and Yeksigian had conducted a field ride with Wagoner. Doc. 154-5, p. 63, ¶ 32.

[28]Doc. 144-19, p. 4, ¶ 12.

[29]Doc. 144-7, p. 6, ¶ 20.

[30]*Id.*

[31]Doc. 144-18, p. 5, ¶ 16.

terminates sales representatives who have been found to intentionally falsify starter forms.[32]  During the phone call in which she was terminated, Wagoner stated that Mohar had "issues" with Wagoner's age.  After her termination, Wagoner sent an email to Mohar in which she stated that she believed the true agenda for her termination was her age because she was given no warning or any disciplinary action. Wagoner registered an "Open Door" complaint when she was terminated.

Plaintiff filed suit on August 8, 2007.  Plaintiff asserts a claim of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  and a claim of intentional infliction of emotional distress.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[33]  "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[34]  A fact is "material" when "it is essential to the proper disposition of the claim."[35]  The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[36]

---

[32]*Id.* Plaintiff attempts to controvert this fact by stating that Batura testified that coaching was an option. The document that Plaintiff relies upon is Batura's statement in an email that he was "ready and willing to provide any starter or related administrative coaching that you feel would be appropriate," but it also stated that he "will, of course, defer to [Chaudhari] and [Yeksigian] on any employment-related decisions." Doc. 154-15, p. 22.

[33]Fed. R. Civ. P. 56©).

[34]*Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[35]*Id.*

[36]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[37]  In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[38]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[39]  The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[40]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[41] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[42]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[43]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important

---

[37]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[38]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[39]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[40]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[41]*Adler*, 144 F.3d at 671.

[42]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[43]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

procedure "designed to secure the just, speedy and inexpensive determination of every action."[44]

## III. Analysis

### A. Age Discrimination Claim

Plaintiff claims that Defendant discriminated against her on the basis of age, in violation of the ADEA, when it terminated her employment. When there is no direct evidence of discrimination, the party may carry its burden by presenting circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting framework.[45]

> [T]he plaintiff first bears the burden of establishing a prima facie case of age discrimination. If the plaintiff carries this burden, the employer must then come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds in this showing, the burden shifts back to the plaintiff to show that the employer's proffered justification is pretextual.[46]

### 1. Prima facie case

To establish a prima facie case of age discrimination with regard to termination, a plaintiff must demonstrate that: "(1) she was within the protected age group; (2) she was doing satisfactory work; (3) she was subjected to an adverse employment action; and (4) her position was filled by a substantially younger person."[47] Defendant concedes that Plaintiff has met the first, third, and fourth

---

[44]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[45]*Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008).

[46]*Id.*

[47]*Nealey v. Water Dist. No. 1 of Johnson County, Kan.*, 554 F. Supp. 2d 1226, 1231 (D. Kan. 2008) (citing *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).

elements of this test but argues that the second element is not met because Plaintiff was not performing satisfactorily.

Plaintiff's burden is not onerous at the prima facie stage.[48]  "[A] plaintiff may meet the second element of a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."[49]  Here, the evidence demonstrates that Plaintiff had been employed for 26 years by Defendant.  This is a significant period of time.  As such, Plaintiff has met her burden in establishing a prima facie case.

### 2. Legitimate, nondiscriminatory reason

The burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the termination. Defendant stated that it terminated Plaintiff because it believed that Plaintiff had violated its policies regarding the distribution of pharmaceuticals in an attempt to create the appearance that she was working consistently in the sales field.  Plaintiff has not challenged Defendant's reason.[50]  Accordingly, Defendant has met its burden in establishing that it terminated Plaintiff for a legitimate, nondiscriminatory reason.

---

[48]*Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[49]*Bolton v. Sprint/United Management Co.*, 220 Fed.Appx. 761, 767 (10th Cir. 2007)(unpublished).

[50]Even if Plaintiff had challenged Defendant's reason, Defendant has met its burden. This burden is "exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).  The Court finds that Defendant's stated reason that it terminated Plaintiff's employment for violation of its policies is a legitimate, non-discriminatory reason.

### 3. *Pretext*

"A plaintiff can show prextext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."[51]  "Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision."[52]  A plaintiff typically makes a showing of pretext with: (1) evidence that defendant's stated reason is false; (2) evidence that defendant acted contrary to a written policy; and (3) evidence that defendant acted contrary to an unwritten policy or practice.[53]

Plaintiff presents several reasons why Defendant's proffered reason for termination is pretext for age discrimination.  First, Plaintiff contends that Defendant did not conduct a longitudinal audit which is contrary to Pfizer's standard policies and procedures.  Second, Plaintiff asserts that her supervisor made disparaging remarks about her age.  Third, Plaintiff contends that Defendant treated her differently that younger sales representatives.  Fourth, Plaintiff states that Pfizer's contradictions and inconsistencies create an inference of pretext.  Finally, Plaintiff contends that Pfizer's proffered reason for termination is false.

### a.  **Longitudinal audit**

Plaintiff asserts that Defendant acted contrary to its standard investigative procedures and

---

[51]*Mickelson v. N.Y. Life Ins. Co.*, 1315 (10th Cir. 2006) (citation and quotation omitted).

[52]*Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007)(citing *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007).

[53]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

policies.  Plaintiff relies upon an email from James Batura, Team Leader of Starter Operations.

Batura's May 19, 2006 email states:

> Depending on the situation, we conduct physician signature audits in either of two ways.
>
> In cases where 'form banking' or the falsification of dates and/or signatures is suspected, we conduct "longitudinal" audits, which entail the selection of 6-8 forms for between 10 and 15 medical practitioners. . . .
>
> In cases where there's more generalized "concern," but little in the way of circumstantial evidence that suggests wrong-doing, we'll randomly select 25+ of a representatives more recently submitted forms . . .
>
> Based on Marj Wagoner's sampling patterns, it might be worthwhile to try the latter approach first, if only to be able to survey large number of the practitioners with whom she's left starters. In my experience, most survey respondents base their replies on the perceived authenticity of their signatures and whether they believe the recorded quantities to be realistic - rather than on the form dates.
>
> Please let me know if you and Elizabeth would like us to undertake a random audit of Marj's SAFs - or conduct a more targeted survey of her most frequently sampled customers . . .[54]

Plaintiff contends that this email states Pfizer's "standard investigative procedures" and because Pfizer stated that it suspected that Plaintiff was "banking" her starter forms and did not conduct a longitudinal audit, a reasonable jury could conclude that Defendant's investigation was a "sham."   The Court is not convinced that one email discussing two possible audits indicates that Pfizer deviated from its standard investigative procedures. Plaintiff has presented no other evidence that Defendant followed this approach when investigating the possibility of falsification of forms

---

[54]Doc. 144-14, pp. 29-30.

or "banking."   Indeed, Batura testified that Defendant does not perform longitudinal audits exclusively when it suspects falsification,[55] and Plaintiff has not directed the Court to any evidence controverting this fact.

The Court also notes that after Batura initially analyzed the findings and attached his report to a  May 12, 2006 email, he raised the possibility of Plaintiff being called to the Regional Office to discuss concerns prior to *any* audit being performed.[56]  Finally, Batura specifically recommended that in Plaintiff's case, it may be worthwhile to try a random audit first.  Defendant stated that it chose the more expedient approach first.  The Court's role is "not to act as a 'super personnel department,' second guessing employer's honestly held (even if erroneous) business judgments."[57] Plaintiff does not raise a genuine issue of material fact as to whether Plaintiff's termination was pretext for age discrimination.

### b. Remarks about Plaintiff's age

Plaintiff contends that her direct supervisor, Mr. Mohar, made repeated age-related comments to her.  Plaintiff states Mohar made the following age related comments:

> (1) During a meeting in 2000 in which Mohar had previously been Plaintiff's district manager, he stated that she had "too much" in her binder and she was "distracting to the younger representatives;"[58]

---

[55]Doc. 154-5, pp. 17-18.

[56]Doc. 144-7, pp. 9-10.

[57]*Riggs,* 497 F.3d at 1119 (citing *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir.2006)).

[58]Doc. 154-5, pp. 57-58, ¶ 5; Doc. 154-3, p. 5.

(2) on September 12, 2005, during a district meeting, Mohar asked: "Marj, when do you plan to retire?;"[59]

(3) Wagoner testified that Mohar "prided himself on cleaning house . . . he liked to hire young reps;"[60]

(4) after a September 27, 2005 field ride, Mohar stated to Plaintiff that she "had a Nancy Timbers adult learning style" which he explained meant that she needed a lot of repetition;[61]

(5) Wagoner testified that Mohar commented to her "aren't your kids out of the house yet?" and;[62]

(6) Wagoner stated that Mohar appeared surprised if Wagoner knew modern musical groups.[63]

The Court will address each of Plaintiff's contentions.  To establish pretext, Plaintiff must demonstrate a nexus between the comment and the adverse employment action.[64]  A discriminatory incident occurring several years before the contested action is "not sufficiently connected to the employment action in question to demonstrate pretext."[65]  In addition, "[i]solated . . . comments are insufficient to establish pretext unless they can somehow be tied to the employment actions disputed

---

[59]Doc. 144-3, pp.23-24.

[60]Doc. 154-3, p. 17.

[61]Doc. 154-3, p. 22.

[62]Doc. 154-3, p. 24.

[63]*Id.*

[64]*Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000).

[65]*Heno v. Sprint/United Management Co.*, 208 F.3d 847, 856 (10th Cir. 2000)(citation omitted).

in the case at hand."[66]

With regard to the first comment, this comment was made in 2000.  This was six years prior to Plaintiff's termination.  As such, it is too temporally remote, and Plaintiff has demonstrated no causal connection to her termination.

With regard to the retirement comment, "questions about an employee's retirement plans, standing alone, are generally insufficient to support an inference of age discrimination."[67] Here, Plaintiff's supervisor made one comment inquiring as to when Plaintiff was planning to retire. This comment was made after Mohar himself stated his retirement plans.  In addition, this comment occurred ten months prior to Plaintiff's termination. Plaintiff has demonstrated no causal connection to her termination, and the comment can best be characterized as an isolated, stray remark.

Plaintiff has taken the third remark out of context.  At the time Plaintiff testified that Mohar made this comment, she was further questioned if Mohar used the term "young," and she stated that he "liked to hire people who hadn't sold before."[68]  She also previously testified in her deposition that Mohar liked "to hire his own reps, train them, hire people who haven't sold before so he can train them in the style with which he likes to have presentations prepared and executed to physicians."[69]  As such, the Court cannot conclude that this was a comment related to age or that it

---

[66]*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006).

[67]*See Holdren v. General Motors Corp.*, 1998 WL 990997, at *4 (D. Kan. Dec. 7, 1998); *see also Carter v. Newman Mem Co. Hosp.*, 49 Fed. App'x 243, 246 (10th Cir. 2002)(unpublished).

[68]Doc. 154-3, p. 17.

[69]Doc. 154-3, p. 16.

had any relation to Plaintiff's termination.

The fourth, fifth, and sixth comments are also insufficient to raise a genuine issue of material fact as to pretext. These are general and ambiguous questions, and the Court again cannot conclude that these comments are related to Plaintiff's age. Even if these comments are considered age-related, Plaintiff has demonstrated no nexus or connection to Plaintiff's termination.

Furthermore, Defendant presented evidence that Mohar did not make the decision to terminate Plaintiff. "[A]ge-related comments by non-decisionmakers are not material in showing the . . . action was based on age discrimination."[70] Plaintiff, however, alleges that Mohar played a key role in Plaintiff's termination.

On March 7, 2006, Mohar requested from Starter Administration a "Starter Activity Report" for Wagoner.[71] He carbon copied his manager, JoAnn Yeksigian, on this email. Plaintiff has shown no relation to this request and to Yeksigian's investigation in May and June of 2006. The fact that Yeksigian was carbon copied on a starter request is immaterial.

Even if this were true, however, Plaintiff has presented no evidence that any alleged age-bias on the part of Mohar influenced Yeksigian and Jenner. Yeksigian and Chaudhari performed the investigation into Plaintiff's starter practices, relying on Batura's and Guess's reviews. Although Mohar informed Plaintiff about the June 29, 2006 meeting at the Regional Office and specifically informed her that she was being terminated, the evidence in front of the Court does not demonstrate

---

[70]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

[71]Doc. 154-15, p. 5.

-20-

that Mohar was instrumental in the decision to terminate Plaintiff's employment.

The Court concludes that even if Mohar's comments could be construed as discriminatory remarks about Plaintiff's age, these remarks are far too attenuated from Plaintiff's termination. Plaintiff has not demonstrated to the Court that any of the comments had any relation to her termination in July of 2006.  Accordingly, this evidence is not sufficient to withstand summary judgment.

### c. Different treatment

Plaintiff asserts that she was treated differently than younger employees because her supervisor, Mohar, conducted field rides more frequently and with less notice.[72]  Plaintiff, however, has provided the Court with no evidence of this fact.  Although Plaintiff asserts that Mohar conducted a field ride with her on September 27, 2005 and October 10, 2005, and this was only two weeks later; the evidence indicates that the next field ride occurred on November 10, 2005.[73]  This indicates that Mohar conducted a field ride once a month, in accordance with Plaintiff's contention that district managers conduct a field ride no more than one time per month.

Plaintiff also provided no evidence that the rides occurred with less notice. "Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext."[74]  Even assuming that there was evidence that Plaintiff was given less advance

---

[72]Plaintiff also contends that she was treated differently because she was the only person Mohar questioned regarding retirement.  The Court addressed Mohar's retirement comment in the section above.

[73]Doc. 163-4, pp. 63-67.

[74]*Kendrick*, 220 F.3d at 1232.

notice than younger sales representatives,  this is a trivial difference in treatment. Plaintiff has not

put forth any evidence from which to infer pretext.

Finally, Plaintiff has not addressed the fact that Defendant terminated younger sales

representatives for the same reason that it terminated Plaintiff. "[A] plaintiff may also show pretext

on a theory of disparate treatment by providing evidence that [s]he was treated differently from other

similarly-situated, nonprotected employees who violated work rules of comparable seriousness."[75]

Defendant presented evidence that it terminated two sales representatives that were under the age

of 40 for falsification of starter forms. As there is no evidence of disparate treatment in Plaintiff's

termination for falsification of starter forms, the Court finds that Plaintiff has not presented any

evidence of pretext based on different treatment of employees.

### d. Alleged contradictions and inconsistencies

Plaintiff asserts that an affidavit by James Batura, provided in support of Defendant's motion

for summary judgment, contradicts his May 12th, 2006 email and prior deposition testimony.  The

Court finds that Batura's affidavit, email, and testimony are consistent.  Batura's May 12th email

stated:

> As your analysis confirms, Marj Wagoner has recorded her starter transactions post-
> FFO on forms used out of sequence more often than not: 273 times out of 644 to be
> exact. . . . These same transactions are listed under the "CTL No Sort" tab, which
> shows what can only be described as a "hopscotch" progression from one day and
> month to another and back.
>
> Although I don't think we have enough information at this point to confirm that Marj

---

[75]*Id.*

is 'banking' her Starter Activity Forms, (an action that our Regulatory counsel has determined is reportable to the FDA as a violation of PDMA), the view under the tab labeled 'Recipient Sort' appears to suggest that possibility in at least a few cases. . . .

I've also reviewed the Starter Activity Forms that you've listed below and agree that at least one of the dates listed on most - if not all of these appear to have been overwritten. If this was done for any reason other than to correct an error, this, too, would be reportable to FDA as a violation of the PDMA.

Are you planning to invite Marj to the Regional Office in order to discuss your concerns further? If so, please let me know how I can be of further assistance and if, in the meantime, you and Elizabeth Chaudhari feel that an audit of these - or other of her Starter Activity Forms is warranted.[76]

Plaintiff takes the May 12, 2006 email out of context quoting only the first part of the sentence "I don't think we have enough information at this point to confirm that Marj is banking her Starter Activity Forms" while omitting the remainder of the sentence that states [it] "*appears to **suggest that possibility** in at least a few cases.*"  (Emphasis added).  In Batura's affidavit, he stated that "[t]he date changes and sequencing of Mrs. Wagoner's starter forms ***suggested*** that Mrs. Wagoner was 'banking' her starter forms . . . ."[77] (Emphasis added). The email and declaration are consistent in that Batura stated that the evidence suggested the possibility of banking.

In addition, Batura's deposition testimony is consistent.  The Court has included the exchange in its entirety:

Q.  So the truth is that Pfizer didn't really have much and they had to conduct some type of a rigid interrogation or investigation to try to get Marjorie Wagoner to admit something because they didn't have anything?

---

[76]Doc. 144-13, pp. 44-45.

[77]Doc. 144-11, p. 5, ¶ 12

-23-

A. We had forms that appear to have had the dates overwritten.  We had what we believed to be an unusual pattern of activity that, at a minimum, suggested poor planning and poor administration.  We did not have any evidence of falsification, but I would think that based on those first two findings – the overwritten dates, the unusual pattern of activity, the other apparent policy violations – management would have an interest in inquiring further and perhaps offering corrective coaching, which would be a good reason to bring her into the regional office.

Q. You said two things I want to follow up on.

A. Okay.

Q. You said, "We did not have any evidence of falsification." That's true, isn't it?

A. We did not have any confirmed evidence of falsification; that's correct."[78]

The Court concludes that Batura's deposition testimony is consistent in that Pfizer did not have confirmed evidence of falsification, but there were unanswered questions regarding Plaintiff's starter forms that suggested the possibility of form banking.

Plaintiff also contends that Defendant's position regarding the identity of the decision makers has been inconsistent and contradictory.  Plaintiff argues that Defendant in its motion for summary judgment seems to be taking the position that Jenner and Yeksigian were not responsible but that an Employee Relations Panel was responsible for the termination.

Defendant's position has not changed.  Defendant responded to Plaintiff's interrogatories by stating that Jenner and Yeksigian were the people responsible for making the decision to terminate, and Defendant specifically states in its brief that Jenner and Yeksigian made the decision. The fact that Defendant also stated that their decision was presented to an Employee Relations Panel does

---

[78]Doc. 154-5, pp. 29-30.

not change the identity of the decision makers.  The Employee Relations Panel merely accepted Jenner and Yeksigian's recommendation to terminate.  Accordingly, the Court finds that Defendant's position regarding the identity of the decision-makers has not shifted and is not contradictory.

Plaintiff next contends that Defendant's suggestion that it would have taken the same action against Wagoner based on the entirety of the evidence, even if she had not expressly admitted to the falsification, is not believable.  Relying on Batura's May 12th email and deposition testimony and Chaudhari's email which stated that they "didn't find much," Plaintiff contends that Pfizer's statement is not believable.  Batura, however,  played no role in Plaintiff's termination, and he stated that he would defer to Yeksigian and Chaudhari on any employment-related decision.[79]  Chaudhari participated in the June 29, 2006 meeting and prepared a report for the Employee Relations Panel, but she did not make the decision to terminate Plaintiff.  It is undisputed that Yeksigian and Jenner made the decision to terminate Plaintiff.

The evidence in front of Yeksigian at the time of Plaintiff's termination included: Plaintiff's name on a No Starter Activity Report; information that Plaintiff had submitted a hotel receipt for work-related reimbursement with the check-in and check-out times omitted and the original receipt showing a check-in and check-out time of mid-afternoon;  Guess's preliminary review indicating that Plaintiff had written incorrect dates, written over and changed dates, and had starter forms out of sequential order; Batura's analysis that indicated sequence changes of 273 times out of 644 and

---

[79]Doc. 144-15, p. 12.

the appearance of overwritten dates; a random audit in which 20 of the 25 doctors verified their signatures; and the June 29, 2006 meeting in which Yeksigian believed Plaintiff stated that she admitted to entering incorrect dates on her starter forms to create the appearance that she was working in the sales field consistently.

Yeksigian passed this information on to Jenner.  Based on the entirety of this evidence, Jenner stated that she would have recommended termination even if Plaintiff had not expressly admitted to falsification. Again, the Court's role is not to second-guess "employer's honestly held (even if erroneous) business judgments."[80]   Plaintiff has failed to raise a genuine issue of material fact on the issue of whether Defendant's stated reason was pretext for age discrimination.

**e. False reason**

Plaintiff contends that Defendant's only stated reason for terminating Plaintiff was that Plaintiff admitted to falsifying starter forms and relies upon one sentence in Defendant's EEOC position statement in which Pfizer stated that Plaintiff was terminated "for admitting to falsifying documentation by changing dates on starter forms in an effort to balance her work activity." Plaintiff states she never admitted to falsifying forms.  Accordingly, Plaintiff contends that the Court must assume that Defendant is being untruthful, and their proffered reason false.

Plaintiff, however, does not include the EEOC position statement in its entirety. The next three pages detail the evidence that Pfizer relied upon to support its decision to terminate Plaintiff.[81]

---

[80]*Brooks v. Holiday Healthcare, L.L.C.*, 2008 WL 4499986, at *9 (D. Kan. Sept. 30, 2008).

[81]This evidence was substantially the same as the evidence put forth in the EEOC position statement.

Pfizer then stated that "[b]ased on the foregoing evidence, Pfizer determined to terminate Ms. Wagoner's employment effective July 14, 2006."[82]

In addition, in support of its motion for summary judgment, Defendant did not contend that its only basis for terminating Plaintiff was her ***admission*** to falsifying starter forms. Although Defendant put forth evidence that the three individuals at the June meeting believed that Plaintiff admitted to falsifying starter forms, Defendant also put forth the evidence that led up to Plaintiff's termination. Defendant asserted that it relied upon both Plaintiff's admission of falsification and the documentary evidence that independently established her falsification of documents.

"In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision.*"[83] "The relevant inquiry in not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."[84] Based on the evidence in front of the Court, it appears that Defendant reasonably believed that Plaintiff had falsified dates on starter forms and that termination was warranted. Plaintiff has not put forth sufficient evidence to create a genuine issue of material fact on the issue of pretext.

Plaintiff has attempted to put forth much evidence that creates an inference of pretext. The Court is mindful that her claim survives if all of the evidence, taken together, creates a genuine issue

---

[82]Doc. 154-15, pp. 35-38.

[83]*Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir 2007)(citations omitted)(emphasis in original).

[84]*Rivera,* 365 F.3d at 924-25 (citation omitted).

as to pretext.[85]   However, much of Plaintiff's evidence is not supported by the record. "Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment."[86]   Plaintiff has presented no evidence that her termination was related to her age. The Court finds that Defendant is entitled to summary judgment on this claim.

**B. Intentional Infliction of Emotional Distress Claim**

Plaintiff also brings a claim of intentional infliction of emotional distress.  In support of her claim, Plaintiff states that Defendant engaged in a persistent and intentional campaign to harass and embarrass her.  Plaintiff specifically states that her district manager first targeted her for humiliation and embarrassment.  Then, Plaintiff states that she was summoned to a meeting in Chicago at which she was interrogated by several individuals with false accusations for approximately four hours. Plaintiff contends that she "had never been treated so horribly in her life."  Plaintiff also stated that the personal attack continued after she left the Chicago meeting when Defendant represented to the FDA and to the Court that Plaintiff admitted falsifying starter forms because she denies that she made this admission.

In support of its motion for summary judgment, Defendant maintains that Plaintiff fails to present sufficient facts to meet the requirement that Defendant's conduct was so extreme and outrageous and the emotional distress was so severe and extreme that the law must step in. As set forth below, Plaintiff has not set forth sufficient evidence from which a reasonable jury could

---

[85]*See Annett v. Univ.of Kansas,* 371 F.3d 1233, 1241 (10th Cir. 2004).

[86]*Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

-28-

conclude that Defendant intentionally inflicted emotional distress on Plaintiff.   Accordingly, summary judgment in favor of Defendant on Plaintiff's claim of intentional infliction of emotional distress is appropriate.

Kansas has a "very high standard for the common law tort of intentional infliction of emotional distress, or as it is sometimes referred to, the tort of outrage."[87] With regard to employment discrimination claims, Kansas courts have been hesitant to extend the cause of action.[88] "Claims of outrage in Kansas are reserved for the most egregious circumstances."[89]   A prima facie case of intentional infliction of emotional distress requires plaintiff to demonstrate that "(1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's emotional distress; and (4) plaintiff's mental distress is extreme and severe."[90]

On a motion for summary judgment, the Court must determine whether plaintiff can meet two threshold requirements. The court must determine (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) whether the emotional distress suffered by plaintiff is of such extreme degree the law must intervene because no

---

[87]*Holdren v. Gen'l Motors Corp.*, 31 F. Supp. 2d 1279, 1282 (D. Kan. 1998)(citation omitted).

[88]*Id.* at 1282-83 (*citing Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir. 1994)).

[89]*McCall v. Bd. of Comm'rs of County of Shawnee, Kan.*, 291 F. Supp. 2d. 1217, 1229 (D. Kan. 2003).

[90]*Id.*

reasonable person should be expected to endure it.[91]   The conduct "must be so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society."[92]

Here, Plaintiff claims that her supervisor targeted her for humiliation and embarrassment. Plaintiff then alleges that she was berated for approximately four hours with repeated accusations of falsification, rapid-fire questions, and humiliating and degrading accusations that Plaintiff was a liar and unprofessional.[93]  Wagoner stated that Yeksigian and Chaudhari told her that they believed that Wagoner was lying.[94]  Plaintiff states that the attack continued when Defendant misrepresented to the FDA that Plaintiff admitted to falsifying forms.

Plaintiff directs the Court to a discussion in *Snider v. Circle K Corporation,*[95] in which the Tenth Circuit upheld a jury verdict for intentional infliction of emotional distress on the basis that the district court did not abuse its discretion in submitting the issue to the jury because the evidence indicated "a sustained, persistent and orchestrated campaign to embarrass and humiliate the plaintiff

---

[91]*McGregor v. City of Olathe, Kan.*, 158 F. Supp. 2d 1225, 1242 (D. Kan. 2001)(*citing Fusaro v. First Family Mortgage Corp.*, 257 Kan. 794, 805, 897 P.2d 123, 131 (1995)).

[92]*McGregor*, 158 F. Supp. 2d at 1242 (citing *Taiwo v. Vu*, 249 Kan. 585, 592, 822 P.2d 1024, 1029 (1991).

[93]Wagoner testified that she believed the meeting was intense, and the situation was rapid-fire. She took several breaks during the meeting to avoid becoming physically ill. Doc. 154-3, pp. 31, 33, 47.

[94]Doc. 154-5, p. 52, ¶ 8.  During her deposition, Wagoner was questioned whether she was called a "liar," and Wagoner stated that Chaudhari "didn't call me a liar. She just said, you know, I don't - I don't believe anything you're saying, I don't believe you, in strong tones."  Doc. 154-3, p. 47. Wagoner stated that Yeksigian said "this isn't what it looks like to me. You know, she was accusatory in her tone, you know, telling me this is really important." *Id.*

[95]923 F.2d 1404 (10th Cir. 1991).

-30-

. . . ."[96] The Court notes that *Snider*, although a Tenth Circuit case, involved the application of Oklahoma law.  Although Kansas and Oklahoma have similar standards for the tort of outrage, *Snider* is not applicable to the facts of this case.

In looking at the evidence in the light most favorable to the Plaintiff, this Court finds that Plaintiff has not presented evidence of extreme or outrageous behavior or a sustained, persistent and orchestrated campaign.  One remark inquiring as to when Plaintiff was going to retire and several ambiguous comments over a period of nine months do not rise to a level of harassment and intimidation.  Even assuming that these remarks were derogatory, which the Court cannot so find, "liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities."[97]

In addition, while the four hour meeting in Chicago may have been hurtful and stressful to Plaintiff, the Court concludes that the treatment was not so egregious to rise to the level of outrage. Plaintiff has not demonstrated that it was part of an orchestrated scheme to inflict emotional distress upon her.  Far worse treatment has been found to be insufficient to state a claim for intentional infliction of emotional distress.[98]

Finally, with regard to Plaintiff's allegation that Defendant misrepresented to the FDA that Plaintiff admitted to falsifying starter forms, the Court finds that this does not constitute intentional

---

[96]*Starr v. Pearle Vision, Inc.,* 54 F.3d 1548, 1559 fn. 7 (discussing *Snider's* applicability).

[97]*Thomason v. Prudential Ins. Co.*, 866 F.Supp. 1329, 1338 (D. Kan. 1994).

[98]*Id.* (finding that even though Defendant's sexual harassment was discourteous, wholly inappropriate, had no place in the workplace, and could constitute the tort of battery, the treatment was not so extreme and outrageous to permit recovery for intentional infliction of emotional distress.)

infliction of emotional distress. In *Taiwo v. Vu*,[99] the Kansas Supreme Court found that the uncontested evidence demonstrating that the defendant lied to the police, filed a false police report for vandalism, and induced an employee to lie to the police to corroborate the false police report was extreme and outrageous behavior.  The Kansas Supreme Court found that the defendant "abused the criminal justice process to her own ends."[100]

The facts are easily distinguishable from the facts in this case.  Here, Defendant is required by the FDA to report any instances of falsification.  Defendant has presented evidence that it believed Plaintiff had admitted to changing dates on her starter forms to spread out her work activity and that it was required to report it to the FDA. Plaintiff has pointed to no evidence, other than her own declaration that she did not make this admission, that demonstrates Defendant intentionally lied to the FDA.

As the Court finds that the conduct does not rise to the necessary level of extreme and outrageous conduct, the Court declines to consider whether Plaintiff's distress was sufficiently extreme. The Court grants Defendant's motion for summary judgment on Plaintiff's claim of intentional infliction of emotional distress.

**IT IS ACCORDINGLY ORDERED** that Defendant Pfizer's Motion for Summary Judgment (Doc. 142) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Expert Report (Doc.

---

[99]249 Kan. 585, 593, 822 P.2d 1024, 1030 (1991).

[100]*Id.*

108), Motion in Limine (Doc. 173), and Motion in Limine (Doc. 175) are DENIED as moot.

**IT IS SO ORDERED.**

Dated this 9th day of February, 2009.

_____/s Eric F. Melgren_____
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE